UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THERESA COSTA o/b/o X.C.,                  :
          Plaintiff,                    :
                             :
          v.                              :     C.A. No. 15-540ML
                             :
CAROLYN W. COLVIN, ACTING                  :
COMMISSIONER OF SOCIAL SECURITY,           :
          Defendant.                    :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Before the Court is Plaintiff Theresa Costa's motion on behalf of her son, X.C., for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Supplemental Security Income ("SSI") under § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) (the "Act"), based on the Administrative Law Judge's ("ALJ") alleged error in finding that, despite a Step Two finding that X.C. has severe attention deficit hyperactivity disorder ("ADHD"), he has a "less than marked" limitation in the domain of attending and completing tasks. Defendant Carolyn W. Colvin asks the Court to affirm the Commissioner's decision. The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the entire record, I find that the ALJ's findings are sufficiently supported by substantial evidence and recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 15) be GRANTED.

I.    <u>Background</u>

    A.    **Plaintiff's Educational and Medical History**

X.C. was born in 2000 and was in eighth grade at the time of the hearing before the ALJ. While Plaintiff alleges onset of disability on May 3, 2012, the record begins in 2011, when X.C. was placed at the Providence Center School, an private educational institution for children "who are experiencing acute behavioral and emotional symptoms,"[1] based on an individualized educational plan ("IEP") that reported that "[X.C.] is frequently angry and disruptive in class, provokes other children, threatens students and staff, and has demonstrated physical aggression," as well as that he was substantially below proficient in reading, mathematics and writing.  Tr. 161.  Also in 2011, psychiatrist Dr. Diana Bradford of Rhode Island Hospital diagnosed "severe ADHD."  Tr. 504.

School records from 2012 at the Providence Center School reflect frequent incidents ranging from bullying other students, physical altercations and bringing a weapon to school to kicking walls and doors, playing with the elevator and stapling the nurse's door lock.  Tr. 559, 568, 593-94.  A report from a January 2012 IEP states that X.C. would frequently interrupt teachers, ignore staff direction and reject staff feedback; "the majority of his behaviors fall under bullying . . . [p]ositive social interaction is difficult for [X.C.]."  Tr. 171.  This IEP also reported "great difficulty focusing on his academics."  Id.

On March 1, 2012, X.C. had a psychiatric evaluation with Dr. Kazi Salahuddin of the Providence Center.  Tr. 760-62.  Dr. Salahuddin noted that X.C. had been a student at the Providence Center School for four months and, since starting medication for ADHD, "has made marked improvement in his behavior and academic performance."  Tr. 760.  On mental status examination, Dr. Salahuddin observed that X.C. was neatly dressed with a stable mood and otherwise appropriate, except that he was somewhat fidgety "though overall his psychomotor activity was within normal limits."  Tr. 761.  Dr. Salahuddin diagnosed ADHD and oppositional

---

[1] https://providencecenter.org/tpc-school (viewed December 21, 2016).

defiant disorder ("OOD") and assessed a Global Assessment of Functioning ("GAF")[2] score of 51, in the range for moderate symptoms.  Tr. 761-62.  When X.C. was seen for follow-up at Rhode Island Hospital in June 2012, Dr. Bradford noted that "[h]is ADHD is well managed by the Providence Center and he is experiencing no side effects from the medication."  Tr. 508. However, in July 2012, the ADHD medication seemed to be causing tics and X.C. was taken off it.  Tr. 768.  Without medication, he became "very hyper, impulsive, defiant and disrespectful," and Dr. Salahuddin prescribed a different ADHD medication.  Tr. 770.  By November 2012, Dr. Salahuddin recorded that "once the meds kick in he does well the rest of the day."  Tr. 773.  By the end of 2012, in December, teacher Lisa Greenhalgh completed a monthly report for X.C. which stated that he had "completed all academic work on time and put in more effort on his homework," as well as that he demonstrated "increased independence on reading assignments." Tr. 975.  By January 2013, Ms. Greenhalgh wrote that he was "producing all writing assignments on time" and "complet[ing] most of his work independently."  Tr. 634.

During 2013, Dr. Salahuddin continued to titrate the ADHD medication.  E.g., Tr. 581, 776, 1071.  In January 2013, he noted that "Mom reports that [X.C.] is doing well both at home and school . . . ADHD well controlled," with all normal findings on mental status examination. Tr. 775.  At other appointments, Dr. Salahuddin recorded, "Attention & Concentration: Alert," although X.C.'s mood was at times depressed and irritable, at times pleasant, at times "euthymic."  Tr. 776, 1071, 1072.  Throughout 2013, school records reflect aggressive behavior and threatening speech directed towards other students, sometimes resulting in physical restraint

---

[2] GAF scores are based on the scale in general use prior to 2014.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR").  The most recent update of the DSM has eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5")). Nevertheless, adjudicators may continue to receive and consider GAF scores.  SSA Admin. Message 13066 at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (viewed Dec. 21, 2016).

by staff, although X.C.'s IEP through the end of 2013 describes X.C. as "a hard working student, who enjoys learning . . . he is completing his homework nightly." Tr. 207, 584, 586; see, e.g., Tr. 644 (Ms. Greenhalgh notes in June 2013 that X.C. had completed three major projects, although homework was minimal). In July 2013, X.C. became involved with the police regarding a stolen car and a break-in at a car dealership. Tr. 581. However, Dr. Salahuddin's treating record from shortly after this incident (August 29, 2013), reflects that X.C. "had a good summer as per mom stayed out of trouble," apart from his recent arrest. Tr. 1072. Dr. Salahuddin noted that X.C.'s medication change had been tolerated well and "so far things have been well at the school," which had just started. On mental status examination, Dr. Salahuddin observed that X.C. was reasonably dressed and exhibited calm behavior, euthymic mood and alert attention and concentration; he made no abnormal findings. Id.

During the first four months of 2014, culminating in the ALJ hearing on May 6, 2014, X.C.'s aggressive behavior exacerbated. In February 2014, he kicked and punched a teacher who was trying to protect another student from him. Tr. 363. Shortly before the ALJ hearing, the record reflects a series of incidents, during which X.C. punched a hole in a wall and attacked a student with a stick, including one incident when he was transported to Rhode Island Hospital in handcuffs; on April 14, 2014, the Providence Center discharged him, finding that its school could no longer meet his needs. Tr. 376, 378, 380, 1074.

Yet in February 2014, Dr. Salahuddin noted that the current regime of medication was controlling ADHD symptoms "fairly well," and that X.C. was making progress and meeting academic goals, although he "can be physically and verbally aggressive;" on mental status examination, all observations were normal and a GAF of 60, reflecting moderate symptoms, was assessed. Tr. 373-75. A psychological evaluation performed in January and February 2014 by

4

Dr. Christina Fucci included the notation that X.C. "demonstrated a hard-working and persistent attitude towards all activities," although Dr. Fucci recommended that he remain in a highly structured, therapeutic academic setting to manage the symptoms of ADHD and OOD.  Tr. 281, 284.  Similarly, a social history assessment completed in February 2014 indicated that X.C. is "making academic progress over time and makes good effort in his classes," as well as that, at home, while he needs prompts and does not have many routine chores, when "something needs to be done, like clean his room, it gets done."  Tr. 272.  And in March 2014, Brian Ferguson, a Senior Behavioral Specialist at the Providence Center School, noted that, "[g]iven time to settle, he is capable of staying on task throughout the day;" according to Mr. Ferguson's assessment, the behaviors to be addressed were defiance/disrespect, disruption and physical aggression.  Tr. 257.

### B.    Opinion Evidence

On April 23, 2013, X.C.'s teacher, Ms. Greenhalgh, completed a Teacher Questionnaire, based on having taught X.C. reading, writing, mathematics and social studies on a regular basis for two years.  Tr. 792.  With respect to attending and completing tasks, she opined that X.C. had a very serious problem carrying out multi-step instructions, waiting to take turns and working without distracting himself or others; a serious problem refocusing to task when necessary; an obvious problem sustaining attention during play/sports activities, focusing long enough to finish assigned activities or tasks, carrying out single-step instructions, changing from one activity to another without being disruptive, completing work accurately without careless mistakes and working at a reasonable pace/finishing on time; and a slight problem paying attention when spoken to, with organizing his own things or school materials and completing class/homework

assignments.  Tr. 794.  Ms. Greenhalgh assigned an array of frequency parameters to these

detailed observations.

On August 27, 2013, a state agency reviewing psychologist, Dr. Clifford Gordon,

reviewed X.C.'s records at the reconsideration stage.  Tr. 95.  Dr. Gordon's file review covered

all of the educational and medical records as of that time; Dr. Gordon specifically referred to his

examination of Ms. Greenhalgh's 2013 questionnaire, Dr. Salahuddin's 2012 psychiatric

evaluation in which he diagnosed ADHD and OOD, as well as Dr. Salahuddin's 2013 progress

note in which he noted the report that X.C. "is doing well both at home and school. . . . Mood has

been stable.  ADHD well controlled.  Doing well in school."  See Tr. 219-26, 760, 775.  Based

on his file review, Dr. Gordon concluded that X.C. suffered from the severe impairment of

ADHD, but found less than marked limitations in four of the six relevant domains: acquiring and

using information, attending and completing tasks, interacting and relating with others and caring

for yourself.  Tr. 95-96.  In the other two domains, moving about and manipulation of objects

and health and physical well-being, he assessed no limitations.  Tr. 96.

On October 2, 2013, treating psychiatrist Dr. Salahuddin filled out a "Functional

Assessment Format and Case Summary for Children Age 12 to Attainment of Age 18" form.  Tr.

1067.  He completed the form by circling multiple-choice responses indicating that X.C. has a

marked degree of limitation in all domains, except for moving about and manipulating objects

and caring for himself, where he noted less than marked limitations.  Tr. 1067-70.

On April 17, 2014, Mr. Ferguson, the behavioral specialist at X.C.'s school, also filled

out the "Functional Assessment Format and Case Summary for Children Age 12 to Attainment

of Age 18" form.  Tr. 455-58.  In it, he opined that X.C. had extreme/marked limitations in the

domain of acquiring and using information; extreme limitations in the domains of attending and

completing tasks and interacting and relating with others; and less than marked limitations in the domains of moving about and manipulating objects and caring for himself. Tr. 455-58.

## II. Travel of the Case

Plaintiff filed an application for SSI benefits for X.C. on December 10, 2012. Following the denial of his claim, initially and on reconsideration, a request for hearing was filed. Accompanied by their attorney, X.C. and his mother appeared and testified at the hearing held on May 6, 2014; the ALJ denied the claim in an unfavorable decision dated July 25, 2014. Tr. 16-35. The Appeals Council upheld the ALJ's decision on September 20, 2014, Tr. 1-3, from which this appeal was filed.

## III. Issues Presented

Plaintiff's motion for reversal rests on the argument that the ALJ erred in finding that X.C. had a less than marked limitation in the domain of attending and completing tasks.

## IV. Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.

Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d

192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied).  Thus, the

Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.

The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of

the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 416.929(a).

Substantial weight should be given to the opinion, diagnosis and medical evidence of a

treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F.

Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on

the nature and severity of a claimant's impairments is well supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L,

2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may

discount a treating physician's opinion or report regarding an inability to work if it is

unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of

Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  Thus, if a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012).  The regulations confirm that, "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  20 C.F.R. § 416.927(c)(2).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 416.927(c).  A treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 416.927(c)(2).

A treating source who is not a licensed physician or psychologist is not an "acceptable medical source."  20 C.F.R. § 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2.  An "other source," such as a teacher or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion

from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions from sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. §§ 416.945-946, or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.  Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).  To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was

insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).

## V.      <u>Childhood Disability Determination</u>

A child under age eighteen is considered disabled, and is entitled to SSI benefits, if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The Social Security regulations include a three-step test for the purpose of adjudicating children's disability claims under this standard. 20 C.F.R. § 416.924(b)-(d). That test, known as the Children's Benefit Analysis, requires the ALJ to determine: (1) whether the child is engaged in "substantial gainful activity," (2) whether the child has "a medically determinable impairment[ ] that is severe," and (3) whether the child's "impairment(s) . . . meet, medically equal, or functionally equal [a] list[ed impairment]." Id.; see generally Fleetwood v. Colvin, 103 F. Supp. 3d 199, 202-03 (D.R.I. 2015). A negative answer at any step precludes a finding of disability. 20 C.F.R. § 416.924(a). "The claimant seeking [childhood] benefits bears the burden of proving that his or her impairment meets or equals a listed impairment." Hall ex rel. Lee v. Apfel, 122 F. Supp. 2d 959, 964 (N.D. Ill. 2000) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)).

In considering whether the child has an impairment or combination of impairments that functionally equals the severity of a listing, the six functional equivalence domains set forth in the regulations must be considered. 20 C.F.R. § 416.926a(g)–(l). They are:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for oneself; and
6. Health and physical well-being.

See 20 C.F.R. § 416.926a(b)(I).  To qualify as functionally equivalent to a listing, the child's

impairment "must result in [either] 'marked' limitations in two domains of functioning or an

'extreme' limitation in one domain."  20 C.F.R. § 416.926a(a).  The child has a "marked"

limitation – i.e., one "that is 'more than moderate' but 'less than extreme'" – when the

impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or

complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  The child has an "extreme" limitation when

the impairment "interferes very seriously with [the child's] ability to independently initiate,

sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

## VI.    Analysis

While the ALJ adopted the opinion of the treating psychiatrist, Dr. Salahuddin, that X.C.

has a marked limitation in interacting and relating with others, he rejected Dr. Salahuddin's

opinion regarding the other domain relevant to this case – attending and completing tasks.  He

relied instead on the opinion of the reviewing expert psychologist, Dr. Gordon, to conclude that

X.C. has less than marked limitations in his functional ability to attend and complete tasks.[3]  Tr.

28-34.  With no marked limitation in at least two domains and no extreme limitation in at least

one domain, the ALJ held that X.C. did not have an impairment or combination of impairments

that functionally equaled the severity of a listed impairment, and therefore is not disabled.  Tr.

---

[3] There is no dispute regarding the ALJ's finding that X.C. had no limitations in the domains of moving about and
manipulating objects and of health and physical well-being, and less than marked limitations in the domains of
acquiring and using information and of the ability to care for himself.  Tr. 28-34.  These findings will not be
discussed further in this report and recommendation.

34; see 20 C.F.R. § 416.926a(d).  Had the ALJ found a marked limitation in attending and completing tasks, a finding of disabled would have been appropriate.  Plaintiff challenges the ALJ's determination as unsupported by substantial evidence.

Plaintiff's argument has a three-part focus.  First, she asks the Court to examine carefully the specific evidence to which the ALJ alludes in his analysis of X.C.'s ability to attend and complete tasks, including his report cards, his mother's statements on the function report and statements made by teachers in IEPs.  Tr. 30.  She argues that this evidence does not actually demonstrate that X.C. retained the functional ability to attend and complete tasks and that, without it, the ALJ's decision is unsupported.  Second, Plaintiff asks the Court to examine the detailed responses filled in by X.C.'s teacher, Ms. Greenhalgh, on the April 23, 2013, questionnaire she completed, rating him as having "a slight problem" to having "a very serious problem," regarding the ability to function in the domain of attending and completing tasks.  Tr. 794.  She argues that the ALJ inexplicably disregarded Ms. Greenhalgh's assessment.[4]  Third, Plaintiff asks the Court to revisit the sufficiency of the ALJ's reasons for affording little probative weight to Dr. Salahuddin's October 2013 opinion.

In challenging the sufficiency of the specific factual evidence marshalled by the ALJ, Plaintiff alleges that the ALJ wrongfully relied on report cards ostensibly showing satisfactory progress, yet these report cards actually show only that X.C. was performing adequately relative to his ability and that he was substantially below proficient in reading, writing and mathematics in 2013 and 2014.  She points to X.C.'s IEPs and argues that the ALJ improperly relied on references to X.C. working hard and retaining information, which Plaintiff claims is pertinent to

---

[4] As a teacher, Ms. Greenhalgh is considered to be an "other source."  The relevant ruling, SSR 06-03p, provides that "[i]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  See SSR 06-03p.

the domain of acquiring and using information, and ignored the many references to X.C.'s tendency to engage in aggressive behavior when asked to complete a task, his need for extra time for tests and assignments and the reference in a 2012/2013 IEP to his ability "to complete 2 out of 5 writing assignments." See Tr. 176. Plaintiff contends that the ALJ should have discounted her own statement on the December 2012 function report that X.C. finished homework and completed things that he started, see Tr. 193, in light of her hearing testimony that she had come to find that "it's kind of, you know, senseless" to ask X.C. to do chores, Tr. 74.

These arguments do not withstand scrutiny.

As the Commissioner points out, the portrait of X.C. painted by the evidence depicts a child whose ability to function is certainly affected by ADHD, but whose attention-related symptoms appeared to respond well to medication, while his primary challenge seems to be the pattern of aggressive behavior towards his fellow students, teachers and staff members. To draw meaning from this record, the ALJ relied heavily on the reviewing expert psychologist, Dr. Gordon, who examined the complex Greenhalgh questionnaire responses, as well as Dr. Salahuddin's longitudinal treating assessment of X.C. Tr. 94-95. Dr. Gordon's opinion is clear that he considered both of these sources, along with the balance of the record, including X.C.'s report cards and IEPs; thus, Dr. Gordon considered each category of evidence on which Plaintiff's argument now focuses.[5] With respect to Ms. Greenhalgh, the ALJ expressly discussed

---

[5] There is one piece of evidence to which Plaintiff refers in her argument on which Dr. Gordon did not rely. That is Plaintiff's own testimony at the May 2014 ALJ hearing that she did not expect X.C. to complete chores. Tr. 74 ("there's no chore list because it's kind of, you know, senseless"). This testimony squarely contradicts her answers on the December 2012 function report that X.C. "helps around the house," "studies and does homework," "works on arts and crafts projects," "[f]inishes things he . . . starts," "[c]ompletes homework," and [c]ompletes homework on time." Tr. 192-93. The ALJ was entitled to, and did, resolve the conflicts in Plaintiff's inconsistent statements by accepting her function report responses over her hearing testimony. See Shaw v. Sec'y of HHS, 25 F.3d 1037, 1994 WL 251000, *4 (1st Cir. 1994) (table decision) ("Resolution of conflicts in the evidence and credibility issues are for the [Commissioner], not the courts."). Therefore, Dr. Gordon's failure to consider Plaintiff's hearing testimony does not alter the analysis.

her responses in his decision; more importantly, he relied on Dr. Gordon's expert analysis of what the responses mean with respect to X.C.'s ability to attend and complete tasks.

As a state agency medical expert in the field of psychology, who is also an expert in Social Security disability evaluations, 20 C.F.R. § 416.927(e)(2)(i), Dr. Gordon evaluated all of this evidence and concluded that X.C. had had a "[p]ositive response to ADHD med management with residual challenges with waiting for his turn and corrying [sic] out multi-step tasks" resulting in less than marked limitations in the domain of attending and completing tasks. Tr. 96.  There is no error in the ALJ's determination to afford substantial weight to this opinion. And with Dr. Gordon's expert opinion, the ALJ did not use his lay judgment to interpret what the seemingly inconsistent references in report cards and IEPs mean with respect to X.C.'s ADHD symptoms and how the relevant references affect the determination of functionality in the domain of attending and completing tasks.  Dr. Gordon deployed his expertise to perform that task, leaving the ALJ's determination in reliance on it well grounded in substantial evidence.

Plaintiff makes a related attack on Dr. Gordon's opinion that may quickly be set aside. Citing Fleetwood v. Colvin, 103 F. Supp. 3d 199 (D.R.I. 2015), she contends that Dr. Gordon's finding of severe ADHD at Step Two compelled him to find marked limitation in attending and completing tasks at Step Three.  This misreads Fleetwood.  In Fleetwood, the Court found it "troublesome" that Dr. Gordon failed to review any of the child's educational records yet rendered an opinion regarding a domain that clearly impacts school performance for a child who had "severe" (as the term is defined at Step Two) ADHD, learning disorder and mood disorder, all of which are disabilities that manifest themselves in the classroom environment.  103 F. Supp. 3d at 204-05.  In this case, there is no suggestion that Dr. Gordon overlooked the educational records; to the contrary, his opinion plainly refers to them.  Tr. 96.

That leaves only Plaintiff's argument that the ALJ nevertheless erred in assigning more weight to Dr. Gordon's opinion while discounting the opinion of the treating psychiatrist, Dr. Salahuddin.  Her attack aims at the ostensible failure of the ALJ's decision adequately to explain the "good reasons" that provide the evidentiary basis for this conclusion.

The ALJ's reasons may be briefly summarized: as the decision states, the Salahuddin opinion "is not supported by or consistent with the mental status examinations of record, the claimant's progress reports and school record, or his activities of daily living as discussed above." Tr. 27.  While terse, these reasons are enough, in that they provide substantial evidence to support the ALJ's determination, particularly where Dr. Salahuddin's opinion consists of nothing more than circled responses on a multiple choice questionnaire and is devoid of clinical or diagnostic information to support or explain the responses.  See 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); Rodriguez v. Sec'y of Health & Human Servs., 46 F.3d 1114, 1995 WL 45781, at *4 (1st Cir. 1995) (table decision) ("The ALJ need not accept an opinion of a physician – even a treating physician – if it is conclusory and brief and unsupported by clinical findings.").

The ALJ's first substantive reason to discount this conclusory opinion focuses on Dr. Salahuddin's inconsistent mental status examinations – these were performed repeatedly during treating appointments and resulted in observations that are generally normal.  More importantly, even when occasional findings like "depressed, irritable" were made, these clinical results still reflect "Attention & Concentration: Alert." See Tr. 374-75, 761, 776, 1071-72.  Based on these observations, Dr. Salahuddin's GAF assessments for X.C. are both in the moderate range.  Tr. 375 (GAF 60); Tr. 761-62 (GAF 51).  Also inconsistent with Dr. Salahuddin's October 2013

opinion are his many treating references, buttressed by those from other treating sources, to X.C.'s improved ability to attend and complete tasks with medication.  See Tr. 508 (Dr. Bradford opines that "ADHD is well managed by the Providence Center"); Tr. 760 (Dr. Salahuddin opines to "marked improvement in behavior and academic performance"); Tr. 773 ( Dr. Salahuddin opines that once "meds kick in he does well the rest of the day"); Tr. 775 (Dr. Salahuddin opines that ADHD well controlled).  Thus, Dr. Salahuddin's treating notes record X.C.'s significant improvements in behavior and concentration after he began to take medication for ADHD, Tr. 765, 767; the deterioration in both areas once that medication was discontinued, Tr. 768, 770, 771; and the return to improved behavior and concentration when a new medication for ADHD was prescribed and his dosage was adjusted, Tr. 773, 775.  There is no error in the ALJ's finding that these objective clinical observations are inconsistent with Dr. Salahuddin's circle on the form indicating that X.C. has marked limitations in his ability to attend and complete tasks.

There also is no error in the ALJ's conclusion that the school records provide additional support for his rejection of Dr. Salahuddin's conclusory opinion.  See Tr. 25.  For example, the progress reports from the teachers, including Ms. Greenhalgh, show that X.C. usually completed his homework and classwork on time with increasing independence.  Tr. 310, 351, 355, 357, 359, 361, 634, 975.  Ms. Greenhalgh's progress report from April 2013 is illustrative: "[X.C.] meets with support staff each week . . . he is able to focus more in class . . . [a]lthough he missed a couple of classes, he has worked hard to complete missing assignments and will often complete extra credit work."  Tr. 640; see Tr. 644 (in June 2013, X.C. able to complete and present three major projects to peers).  These education records repeatedly reflect teacher comments that X.C. was completing at least some of his homework, was "capable of staying on task all day," and that he had "completed everything."  Tr. 207, 257, 351, 610.  Finally, there is no error in the ALJ's

reliance on the inconsistency between Dr. Salahuddin's opinion of marked attentional limitations and X.C.'s activities of daily living, including those reflected in the function report completed by Plaintiff indicating that X.C. completes homework on time, works on arts and crafts projects, and finishes things he starts, as well as X.C.'s testimony that he takes care of his room, does dishes, cleans the kitchen, takes out the garbage, picks up outside and likes to do puzzles, color, play games, do crosswords and play video games.  Tr. 24, 61-62, 192-93.

The ALJ was not required to afford greater weight to Dr. Salahuddin just because he is a treating source: "[t]he law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians."  Arroyo v. Sec'y Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991).  At bottom, Plaintiff's arguments inappropriately ask the Court to re-weigh these two opinions in a manner more favorable to Plaintiff.  That is not the function of judicial review – "[w]here the facts permit diverse inferences, we will affirm the Secretary even if we might have reached a different result."  Shaw v. Sec'y of HHS, 25 F.3d 1037, 1994 WL 251000, *4 (1st Cir. 1994) (table decision).  The ALJ properly examined conflicting evidence in this record and reached a conclusion that is amply supported by substantial evidence.  Benetti v. Barnhart, 193 F. App'x 6, 2006 WL 2555972, at *7 (1st Cir. 2006) (per curiam).  With no error in the ALJ's evaluation of the medical opinions and other evidence of record, there is no basis for remand of the denial of benefits.

**VII.**   **Conclusion**

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 15) be GRANTED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of

the Court within fourteen (14) days after its service on the objecting party.  <u>See</u> Fed. R. Civ. P.

72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes

waiver of the right to review by the district judge and the right to appeal the Court's decision.

<u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v.</u>

<u>Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 21, 2016